PENNSYLVANIA TURNPIKE COMMIS-
SION, to the Use of Alex FINK and
Nathan Fink, trading as Perry Con-
struction Co.

v.

SEABOARD SURETY COMPANY.

WENGER BROTHERS, INC.

v.

UNITED STATES FIDELITY & GUAR-
ANTEE CO.
and
Alex Fink and Nathan Fink, trading as
Perry Construction Co., a partnership.

Civ. A. Nos. 19974, 21794.

United States District Court
E. D. Pennsylvania.

Sept. 3, 1958.

Walter Stein, Harold Berger, Berger &
Gelman, Philadelphia, Pa., for Pennsyl-
vania Turnpike Commission, to Use Alex
Fink and Nathan Fink, trading as Perry
Const. Co. and United States Fidelity &
Guarantee Co.

John B. Martin, Frank K. Tarbox,
Duane, Morris & Heckscher, Philadel-
phia, Pa., Jonathan B. Hillegass, Hille-
gass & Moran, Norristown, Pa., for
Wenger Brothers, Inc. and Seaboard
Surety Co.

EGAN, District Judge.

These two actions were consolidated
for trial by jury. A joint motion for a
new trial has been filed on behalf of the
losing parties, i. e., Seaboard Surety

Company, in Civil Action No. 19974 and Wenger Brothers, Inc., in Civil Action No. 21794. The motion will be denied.

The cases are here by reason of diversity of citizenship of the parties. They grow out of the construction and completion of a portion of the Northeast Extension of the Pennsylvania Turnpike.

Howard Worthington (Worthington) was awarded the prime contract. He sub-contracted all the right of way excavation work to Wenger Brothers, Inc. (Wenger). Wenger, in turn, sub-contracted all the blasting and rock excavation on the job to the Perry Construction Company (Perry), of which Alex Fink and Nathan Fink are partners. Both sub-contractors are bonded and the appropriate surety company is named as defendant in each action.

In Civil Action No. 19974, Perry, as use-plaintiff, alleges that according to its sub-contract with Wenger, it was to be compensated on the basis of the amount of cubic yards of rock drilled and blasted; that a certain amount of rock was drilled and blasted for which it has not been paid. Wenger, through its surety, Seaboard Surety Company (Seaboard), claims that Perry did not blast as much as it claims and that that which was blasted was not done in accordance with the terms of the contracts involved. This latter allegation gives rise to Civil Action No. 21794.

There, Wenger alleges that Perry's failure to blast in accordance with the terms of the governing contract and Perry's delays in prosecuting this work forced Wenger to hire and use extra equipment and men to complete the job. These additional expenses, Wenger claims, resulted in damage far in excess of the amount admittedly due Perry. As the cases went to the jury, the latter suit was treated as a counter-claim to the amount claimed by Perry in the earlier action.

After an extensive charge, the case was submitted to the jury, which later returned with a verdict in favor of Perry in the amount of $111,323.98 in Civil Action No. 19974. In Civil Action No. 21794, the jury disallowed the entire claim of Wenger, returning a verdict therein in favor of the defendants, United States Fidelity & Guarantee Company and Perry.

Trial counsel for Wenger and Seaboard were evidently satisfied with the Court's charge to the jury because they took no exceptions and withdrew their points for charge which they had earlier submitted. However, the jury's verdicts caused them to file the joint motion for a new trial which is now before us.

While Wenger and Seaboard complain on several grounds, one of the most important is that the Court erred when it affirmed Perry's point for charge number 5. During the course of trial, Wenger and Seaboard called the Perry foreman, Sanford Vanderveken and a DuPont powder salesman, C. Huber Blocher, for direct examination. Each witness testified favorably on direct, and unfavorably on cross. The Court charged:

"No. 5. I will affirm, and that reads as follows:

"Mr. Vanderveken and Mr. Blocher are witnesses for the defendant. The rule is that a party who produces a witness holds him out as worthy of belief, and is bound by his testimony even so far as it might be against him, and is, indeed, concluded by his testimony, unless it is contradicted by the testimony of other witnesses or the circumstances surrounding the case.

"I will affirm that in part as modified by my instructions." (N.T. 768–769.)

■ Wenger and Seaboard *now* object to the charge on the ground that it created an improper inference. The arguments presented by them fall short of the *Pennsylvania* authorities cited, although the Court is in doubt as to whether State or Federal law is applicable in the first instance. However, in view of the fact that counsel failed to take exception to the charge at the time of trial, this question need not be passed upon at this time.

Rule 51 of the Federal Rules of Civil Procedure clearly states:

"* * * No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."[1]

This alone is dispositive of the question before the Court.

■■ We next come to Wegner's and Seaboard's contention that the verdicts are contrary to the overwhelming weight of the evidence. With this, we disagree. In considering this phase of the motion, we must remeber that where the evidence is conflicting, all the evidence must be viewed in the light most favorable to the party who holds the verdict. Schipfer v. Makowski, D.C.E.D.Pa.1957, 149 F.Supp. 659.

In their brief, Wenger and Seaboard stated their defense very simply: "The defense is that Perry did not blast as much as they claim, and that they failed to blast in accordance with their contract, * * *."

Let us first examine the charge that they failed to blast in accordance with their contract. Wenger and Seaboard have shifted their position on this point at various times.

There are no standards set up with respect to the size of the blasted rock to be recovered in either the prime contract with Worthington or in the written contract between Perry and Wenger. Wenger, in its claim asserting that the rock wasn't blasted small enough, in conformity with its agreement with Perry, was forced to rely on a parol agreement made with one of the Fink brothers after the written contract was signed. On cross-examination, Mr. Alex Fink confirmed the fact that the rock was to be broken into sizes small enough to fit a 2½ yard bucket of a power shovel. However, he testified that the rock was so broken.

In paragraph 7(a) of the Wenger complaint, in Civil Action No. 21794, it is stated: "They did not break the blasted rock into such size that it would meet with the specifications of the Turnpike Commission in order that it could be used for fill." They were forced to flee from this position when it became apparent that the specifications of the Turnpike Commission were silent on this point.

They then retreated to the position that it was Perry's duty to blast the rock to a size not in excess of 18 inches in diameter so that it could be used for fill. This contention also collapsed when it was shown that the Turnpike specifications again were silent on this matter.

Wenger's witness, William H. Sutcliffe, an employee of Wenger, produced certain pictures allegedly taken on the job which purported to show broken rock too large to be handled by a 2½ yard shovel. Wilmer Wenger later testified that he had not shown the pictures to Perry or anyone interested until the date of trial, some two years after they were taken. Whether they were taken on the job in question and whether they were taken before Perry did secondary blasting—and there was testimony that Perry did secondary blasting—were matters for the jury. Both Worthington and Robert L. Jamieson, the Turnpike engineer, testified that Perry did their job in a workmanlike way. Perry's foreman, Vanderveken, testified similarly.

During the course of the job, Perry engaged the DuPont Company, who supplied the powder and dynamite, as consultants. Their representative, Mr. Blocher, was called as Wenger's and Seaboard's witness. His reports to his employer (DuPont) were heavily relied upon by Wenger and Seaboard. On the whole, they show that some earlier difficulties, which were encountered by Perry, were corrected and that in the end the Wengers were pleased. In his report of February 21, 1955, he notes that at lunch, the Wengers said that they were pleased. Similarly, on June 27, 1955, it is noted

---

1. See the multitude of cases cited under Note 12 of Rule 51, 28 U.S.C.A.

that a good job, very much liked by the Philadelphia Electric Company and the Turnpike Commission, was being done. These reports all appeared as part of the Wenger-Seaboard case. These facts, as outlined above, speak for themselves. The Court need not comment, other than to say that the losing parties' claim on these grounds is without foundation.

Wenger and Seaboard next contend that there was a contractual obligation on the part of Perry to drill and blast at least 2000 cubic yards of rock per working day. There is a written contract between the parties covering the duties and obligations of Perry which makes no mention of such a requirement. However, Mr. Alex Fink testified on cross-examination:

"A. After we had signed the contract and come to terms on the contract, there was a discussion where we asked—when I say we, I am referring to the company, the Perry Construction Co.—asked the Wengers what they expected per day. Does that answer the question?

"Q. Well, what's the answer? A. We asked them that, and they came back with an answer that they would like to get 2000 yards per day.

"Q. 2000 cubic yards? A. Cubic yards, yes.

"Q. That would be rock broken up and removed from its fixed position; is that correct? A. Correct.

"Q. Well, what did you say to that? A. I said they would try, that we would try to do that much if it were possible.

"Q. Didn't you go a bit further and say, 'We can make 2000 easily?' A. Perhaps I did say it, because given proper conditions prepared, we could do more than 2000, and did more than 2000 in several instances." (N.T. 63.)

The total number of cubic yards blasted was the ultimate and most important issue of the case. Four experts were called to testify as to this controversy.

Needless to say, there was general disagreement. However, according to the final verdict, the jury believed the testimony of Paul Lucas, and according to his calculations, more than 2000 cubic yards a day was averaged. This is fact *now* and avoids the necessity of establishing whether or not the 2000 cubic yards per day "condition" was part of the contract.

Wenger and Seaboard contend, however, that the jury's verdict in this respect was against the weight of the evidence. Their witness, Joseph E. Russell, a registered engineer, upon whom they rely so heavily, was thoroughly discredited. He told the jury he was engaged by Wenger to prepare the bid for submission to the prime contractor, Worthington, and that he did so by gathering information from people he talked to but that he never looked at the drawings of the Turnpike Extension, although he knew of their existence. He also testified as to other matters which were contradicted by the other witnesses. We believe that the jury properly disregarded his testimony.

Perry's witness, Lucas, on the other hand, appeared to be a thorough and candid witness. He readily admitted certain shortcomings in his methods, and by doing this, impressed both the Court and the jury. The latter was manifested when the jury returned a verdict consistent with Lucas' calculations, although they could have brought in a higher amount if they believed the testimony of Robert Curtis, Worthington's engineer.

So far as the Wenger counter-claim is concerned, we can find no error in the jury's verdict. The Court gave Wenger great latitude in its attempted proof. The kind of evidence offered by Wenger was vague and uncertain. The need for the use of extra equipment, or the so-called delay allegedly caused by Perry, which brought about the necessity for the extra equipment and labor was shown in an equally vague and uncertain manner. For instance, such testimony as "the rental is between $15 and $30" and "between $12 and $15 per hour" was permitted. But despite this latitude, the

jury completely disallowed the counterclaim.

From what we stated earlier in connection with the "agreement" as to the size of the rock and from the fact that Wenger apparently was satisfied with the work at the time of its performance, we are of the opinion that the verdict of the jury was justified.

Seaboard further contends that the verdict in favor of Perry was excessive. With this, we completely disagree.

The Court, in its charge, instructed the jury that if they believed that Perry had met its burden of proof in establishing Seaboard's liability, they could find for Perry in the amount of $111,323.98, which was the figure submitted by Lucas or in the larger amount of $118,426.97, which was the figure submitted by the Worthington engineer, Curtis. The Court, in this connection, also instructed the jury that if they believed Russell, Wenger's engineer, their verdict for Perry would be in a lesser amount. In addition, the Court read to the jury a detailed written statement of the counter-claim prepared by Wenger at the Court's request. The jury was told that they could find for Wenger (exonerating Seaboard) if they decided that the counter-claim had substance.

A verdict was returned for Perry in accordance with the Lucas figures, which were smaller than Curtis'. To that extent, they made a concession to Seaboard. From all of the evidence, we feel that Lucas' testimony was competent; his methods reasonable; and his calculations substantially in accordance with accepted engineering standards. *None* of the engineers measured the rock in place as it had been put there by Mother Nature. We doubt that they could have done so had they so desired. *All* the figures were based on engineering estimates. In this light, the Lucas figures were acceptable.[2]

█ Wenger next argues that the Court erred in allowing the witness, Robert L. Jamieson, the Turnpike resident engineer, to express a conclusion as to the meaning of the written contract between the parties. The item in question amounts to $6,000 which Wenger claims as a "clean-up" expenditure.

The situation arose when Perry's counsel asked Jamieson if the work of Perry was completed when he inspected the job in September of 1955. Over the objection of Wenger, the witness was permitted to answer that the job was completed at the time of his inspection as far as Perry was concerned. From this Wenger argues that Jamieson was interpreting the contract; that it was an invasion of the province of the Court and jury and that it was prejudicial to Wenger.

This argument, we believe, is lacking in validity. What Mr. Jamieson said was merely a repetition of something he testified to earlier in the trial *without objection*. At page 595, the following is transcribed:

"Q. Was there anything to be cleaned up? A. Not in the work of cleaning up under blasting or drilling.

"Q. Nothing by Perry? A. Yes, that is the main thing.

"The Court: May I ask a question?

"The Witness: Yes.

"By the Court: Q. What was cleaned up? What did you require to be cleaned? A. In the Turnpike?

"Q. Yes, on this portion of the Turnpike. A. Oh, well, you had to clean up those cans, oil cans, and everything, rubbish, you could imagine during the course of the operation.

"Q. That pertained to the principal contract? A. Yes, that pertained to Mr. Worthington.

"Q. It had nothing to do—A. With Perry.

"Q. —with the blasting? A. No, sir."

2. The Turnpike Commission's specifications called for calculations from "cross-sectional measurements." This procedure was followed by Lucas.

Mr. Jamieson, as the engineer in charge of the job for the Turnpike Commission, was well qualified to explain what was meant by "cleaning-up." It was his duty to determine whether the job was properly completed or not. The facts that the earlier testimony came in without objection; that others (Wilmer Wenger, Alex Fink, et al.) had testified similarly, and finally because of Jamieson's qualifications, lead this Court to conclude that no error was committed in permitting the testimony.

We are of the opinion that all parties received a full, fair and complete trial and one that was free from substantial error. The losing parties' apparent satisfaction was manifested when they expressed their satisfaction with the charge. They are not *now* entitled to a new trial.